**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
─────────────────────────────────

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

      **v.**                                **07-CR-193-A**

**VEDRAN ZAVISIC,**

                **Defendant.**
─────────────────────────────────


## REPORT, RECOMMENDATION AND ORDER

       This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  Text Order of Referral dated October 12, 2011.


## PRELIMINARY STATEMENT

       The defendant, Vedran Zavisic ("the defendant"), is charged in a four count indictment with having violated Title 21, United States Code, Sections 841(a)(1), 846, 952(a) and 963.  Dkt. #1.  He has filed a motion seeking dismissal of this indictment on the ground that his rights to a speedy trial under the Sixth Amendment to the United States Constitution have been violated.  Dkt. #15.  The government has filed a response in opposition to this motion.  Dkt. #19.  The defendant thereafter filed a reply in further support of his motion.  Dkt. #20.  Oral argument on the motion was heard by this Court on May 23, 2013 and the matter was taken under advisement.

## <u>FACTS</u>

The defendant was originally charged in a Criminal Complaint (06-M-121) with having violated Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(3), as well as Title 19, United States Code, Section 1461 on October 10, 2006. Case No. 06-M-121, Dkt. #1. He initially appeared before this Court in response to these charges on October 10, 2006 and was released on a $5,000 Cash Appearance Bond co-signed by his parents, was escorted back to Ontario, Canada and allowed to return to his place of residence. Case No. 06-M-121, Dkt. #4. At these proceedings, the defendant requested assignment of counsel, and after having been found financially qualified, the Court assigned the Federal Public Defender's Office to represent him. The matter was adjourned to October 25, 2006 for a preliminary hearing.

On October 25, 2006, the defendant, by his counsel, requested an adjournment of the preliminary hearing relative to the charges in the Criminal Complaint which request was granted. The Court adjourned the matter to December 27, 2006 with a conditional order that if the matter was not resolved by that date, the Criminal Complaint would be automatically dismissed without prejudice pursuant to Rule 48 of the Federal Rules of Criminal Procedure. Dkt. #6. On January 3, 2007, a Text Order was issued dismissing the complaint without prejudice pursuant to Rule 48 of the Federal Rules of Criminal Procedure.[1] Dkt. #7. No bail violation was ever filed against the defendant and he did not fail to appear at any required court appearance. Dkt. #15-

---

[1] Pursuant to this Court's October 25, 2006 conditional Order, the Criminal Complaint was dismissed effective December 27, 2006.

1, ¶ 8.  Thereafter, upon the application of the defendant's mother, Dragica Zavisic, the Court refunded the $5,000 bail the defendant had deposited with the Clerk of Court. Case No. 06-M-121, Dkt. #9.

According to the government, in or about May, 2007, a cooperating source provided information that the defendant, "based on the details given by the source as to the details of the arrest, fled from Canada back to his homeland in Eastern Europe."[2] Dkt. #19, p.4.  On August 14, 2007, a sealed indictment against the defendant was filed charging him with having violated Title 21, United States Code, Sections 841(a)(1), 846, 952(a) and 963.  Dkt. #1.  A warrant for his arrest was issued on that date.  In its response to the instant motion, the government states, "In August of 2007, Zavisic was entered into NCIC as a fugitive by ICE, NCIC NIC#W812879286."[3] Dkt. #19, p.4.  Thereafter, a U.S. Customs Fugitive Report was filed on August 27, 2007.  *Id*.

According to the defendant, in or about July 2007, he accepted a position as a call center manager at Studio Moderna in Novi Sad, Serbia and he began work

---

[2] The Court takes exception with the government's characterization that the defendant "fled from Canada."  As of December 27, 2006, the Criminal Complaint against the defendant was dismissed and there was no restriction on the defendant's right to travel.

[3] Again, the Court takes exception with the government's characterization of Zavisic as a "fugitive." Insofar as the Criminal Complaint was dismissed as of December 27, 2006, and the Indictment returned and arrest warrant issued in August 2007, the defendant was not a fugitive, but rather, as of August 14, 2007, a named defendant in a sealed Indictment and a subject of an arrest warrant.

there on August 27, 2007 and continued his employment there until September 2012. Dkt. #15-1, ¶¶13-14.    On October 14, 2007, the defendant was married to Bosilika Zaric, a Canadian citizen and on June 6, 2008, they had their only child.  Dkt. #15-1, ¶¶15-16.  In 2008, the defendant applied to the Canadian government for recognition of his son's Canadian citizenship and for a Canadian passport for his son.  *Id*. at ¶18.  The application filed with the Canadian embassy in Belgrade contained the defendant's home address and other contact information.  *Id*. at ¶19.  The requests for Canadian citizenship and a Canadian passport were granted.  *Id*. at ¶20.

According to the defendant, his work required extensive travel and he traveled using his Canadian passport, repeatedly crossing both European Union and Non-European Union crossings.  Dkt. #15-1, ¶¶24-25.  Moreover, the defendant maintains that he lived openly and in plain sight and filed his Serbian address with the Canadian embassy.  *Id*. at ¶¶ 23 and 25.  "As a non-citizen, the Serbian government imposed stringent requirements upon him.  To satisfy these obligations, Mr. Zavisic maintained a visa filed with the Ministry of the Interior, maintained a file with the police in Novi Sad, appeared for interviews at the police station, and then checked in at the station every three months, and maintained a work permit issued by the Labor Office."  *Id*. at ¶¶28-29.  In or about February 2009, the defendant became a dual Serbian-Canadian citizen.  *Id*. at ¶29.

Notwithstanding the information obtained from a cooperating source in May 2007, it was not until August 24, 2009, that Immigration and Customs Enforcement (over two years from the date the sealed Indictment was returned) requested information from Canadian authorities to determine whether the defendant had in fact left Canada. Dkt. #19, pp.4-5. In a Report of Investigation dated August 24, 2009, an ICE Special Agent states, "Once a determination has been made to determine where Zavisic may be residing SA Pavlovic will reach out to Law Enforcement personal [sic] operating in that area of responsibility in an effort to bring him to Justice here in the Western District of New York." Dkt. #19-1, p.16.

In or about June 2011, the defendant applied to the Canadian embassy to replace his expired passport and he filed his latest home and work addresses with the Canadian embassy at that time. Dkt. #15-1, ¶30.

After another two years, on September 1, 2011, ICE Buffalo reached out via e-mail to the Homeland Security Investigations Deputy Attache at the U.S. Embassy in Vienna, Austria for assistance in locating the defendant. Dkt. #19, p.5 and Dkt. #19-1, pp.17-19. It is clear from the e-mail exchanges that although an arrest warrant had been entered into NCIC, an arrest warrant had not yet been filed with Interpol. Dkt. #19-1, p.18. On September 14, 2011, the prosecutor executed the Prosecutor's Agreement to Extradite. Dkt. #19-1, p.21. In order to complete an Interpol Red Notice (International wanted persons alert), the arrest warrant and Indictment were unsealed on or about October 12, 2011. Dkt. #19, p.5. As of February 10, 2012, the Red Notice

was filed with Interpol.  Dkt. #19-1, p.38.  On February 17, 2012, the defendant was arrested attempting to cross the land border from Serbia into Hungary.  Dkt. #19-1, p.45.  On or before February 20, 2012, Interpol advised ICE that law enforcement in Budapest, Hungary had the defendant in custody on the Red Notice.  Dkt. #19-1, p.40. The extradition package was signed by the AUSA on March 15, 2012 and Hungary ordered the extradition of the defendant on June 28, 2012.  Dkt. #19, p.5.  The defendant was escorted from Budapest, Hungary to the United States by the United States Marshals Service on September 21, 2012.  On September 28, 2012, the defendant was formally arraigned on the Indictment and this Court granted the government's motion to detain the defendant.  On that same date, this Court entered a Scheduling Order setting a December 14, 2012 deadline for the filing of motions and excluding the time for speedy trial purposes pursuant to and in accordance with the provisions contained in Title 18 U.S.C. §§ 3161(h)(7)(A) and 3161(h)(7)(B)(iv).  Dkt. #5.

On December 13, 2012, the defendant, by his counsel, filed a motion seeking an extension of time within which to file all pretrial motions.  Dkt. #8.  The Court granted the motion and ordered motions to be filed by February 8, 2013.  Dkt. #11.  The time from December 13, 2012 to February 8, 2013 was excluded for speedy trial purposes pursuant to and in accordance with the provisions contained in Title 18 U.S.C. §§ 3161(h)(7)(A) and 3161(h)(7)(B)(iv).  *Id*.  On February 8, 2013, the defendant, by his counsel, filed a second motion seeking an extension of time within which to file all pretrial motions.  Dkt. #12.  The Court granted the motion and ordered motions to be filed by March 22, 2013.  Dkt. #14.  The time from February 8, 2013 to March 22, 2013

was excluded for speedy trial purposes pursuant to and in accordance with the provisions contained in Title 18 U.S.C. §§ 3161(h)(7)(A) and 3161(h)(7)(B)(iv). *Id*.

On March 22, 2013, the defendant, by his counsel, filed an omnibus discovery motion and a motion to dismiss the indictment for a violation of the Sixth Amendment right to a speedy trial. Dkt. #15. On May 23, 2013, oral argument on defendant's motions was heard by this Court.

## DISCUSSION AND ANALYSIS

The defendant argues that the period of delay at issue runs from the dismissal of the Criminal Complaint (according to defendant, January 3, 2007) until the commencement of the extradition proceedings (on or about March 28, 2012), a period of five years and three months according to the defendant's calculation. Dkt. #15, p.4. In support of his motion to dismiss the indictment, the defendant asserts that during this time, he was living openly, traveling frequently under his own name and keeping two governments informed of his whereabouts.

In response to the defendant's assertions, the government argues that,

assuming that the government did nothing else but indict the defendant and wait for his arrest on February 17, 2012, the alleged period of delay that should be considered by the Court is approximately 54 months. But, in actuality the time should only be counted between the return of the Indictment and the time the government initiated the Red Notice process with the Office of International Affairs and Interpol. In addition there are other instances of due diligence that

was put forth by the government in the procedural history, <u>infra</u>.

Dkt. #19, p,10. To its credit, the government does acknowledge that there was a lengthy period of delay (approximately 49 months) in seeking the defendant's extradition that "likely falls within the purview of what both the Supreme Court and the Second Circuit have deemed as presumptively prejudicial." *Id*. at p.11.

The language of the United States Supreme Court in *Doggett v. United States*, 505 U.S. 647 (1992) is most applicable to the factual circumstances in the case at hand and therefore, brevity will be sacrificed intentionally by setting it forth at length:

> We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration**,**" "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence. [*Barker v. Wingo*, 407 U.S. 514, 532, 92 S. Ct. 2182, 2192, 33 L.Ed.2d 101 (1972)]; *see also Smith v. Hooey*, 393 U.S. 374, 377-379, 21 L.Ed.2d 607, 89 S. Ct. 575 (1969); *United States v. Ewell*, 383 U.S. 116, 120, 15 L.Ed.2d 627, 86 S. Ct. 773, 776 (1966).

> \*   \*   \*

> *Barker* stressed that official bad faith in causing delay will be weighed heavily against the government, 407 U.S. at 531, 92 S. Ct. 2182. . . . Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him . . . . *Barker* made it clear that "different weights [are to be] assigned to different reasons"

for delay.  *Ibid*.  Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.  And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows.  Thus, our toleration of such negligence varies inversely with its protractedness, *cf. Arizona v. Youngblood*, 488 U.S. 51, 101 L.Ed.2d 281, 109 S. Ct. 333 (1988), and its consequent threat to the fairness of the accused's trial.  Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority.  The government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the government attaches to securing a conviction, the harder it will try to get it.

*Id*. at 654, 656-57.

As a result of the government's acknowledgment of "presumptively prejudicial delay" between the time of the indictment and either the sending of the Red Notice package on September 30, 2011 or the signing of the Prosecutor's Agreement to Extradite on September 14, 2011, this factor operates as a "triggering mechanism" requiring an analysis and consideration of three other factors in determining whether the defendant's Sixth Amendment right to a speedy trial has been violated.  *Barker v. Wingo, supra* at 530; *Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988).  These three factors are: (1) the length of the delay; (2) the reason for the delay; and (3) the defendant's assertion of his right.  *Barker, supra* at 530.  The following constitutes such an analysis.

**(1) The Length of Delay**[4]

In determining the length of delay to be considered, the Court must "engage in a balancing process whereby the conduct of both the prosecution and the defense are weighed." *United States v. Saric,* 2011 WL 31079 (S.D.N.Y. 2011). The defendant argues that the calculation of the period of delay should begin with the January 3, 2007 text order dismissing the Criminal Complaint. The government maintains that the period of delay should commence with the August 14, 2007, return of the Indictment. By reason of the fact that the Criminal Complaint was dismissed as of December 27, 2006 and no charges were pending and the defendant was not a fugitive, this Court agrees that the period of delay commences on August 14, 2007.

The government asserts that the period of delay to be considered concludes with either the sending of the Red Notice package on September 30, 2011 or the signing of the Prosecutor's Agreement to Extradite on September 14, 2011. Dkt. #19, p.11. Conversely, the defendant maintains that the period of delay concludes with the commencement of extradition proceedings, on or about March 28, 2012. Dkt. #15, pp.9-10. Using the defendant's dates, January 3, 2007 to March 28, 2012, the period

---

[4] The defendant was charged in a Criminal Complaint on October 10, 2006. Following an appearance on October 25, 2006, the Court adjourned the matter to December 27, 2006 with a conditional order that if the matter was not resolved by that date, the Criminal Complaint would be automatically dismissed without prejudice pursuant to Rule 48 of the Federal Rules of Criminal Procedure. On January 3, 2007, a Text Order was issued dismissing the complaint without prejudice pursuant to Rule 48 of the Federal Rules of Criminal Procedure. The defendant was never charged with a bail violation and in fact, the $5,000 cash bail was returned to the defendant's mother. Accordingly, this Court concludes that contrary to defendant's assertion the period of delay does not commence on the date the Criminal Complaint was dismissed.

of delay would be sixty-three (63) months.  Using the government's dates, August 14, 2007 to either September 14, 2011 or September 30, 2011, the length of the delay would be approximately forty-nine (49) months.  Even if the period of delay is calculated from the date the Indictment was returned (August 14, 2007) to the date the defendant was arrested (approximately February 17, 2012), the alleged period of delay would be fifty-four (54) months.

It is this Court's opinion that the period of delay begins with the return of the sealed Indictment on August 14, 2007.  With respect to the end date, the choice of dates proposed by the government, September 14, 2011 (the date the prosecutor signed the Prosecutor's Agreement to Extradite) or September 30, 2011 (the date the initial Red Notice application was sent) are both inappropriate dates to conclude the calculation of the length of delay.  The government's response to the instant motion (and the attachments thereto) reveal that the Red Notice that was sent on September 30, 2011 was simply the application and that as late as October 5, 2011, additional information was being sought for the completion of the application.  See Dkt. #19-1, p.30.  In order to complete an Interpol Red Notice (International wanted persons alert), the arrest warrant and Indictment were unsealed on October 12, 2011.  The record does not reflect the date on which the final Red Notice was filed with Interpol.  However, an e-mail from the ICE Special Agent to the AUSA on February 10, 2012 states, "as of now, I have filed the Red Notice with Interpol. . . ."  Dkt. #19-1, p.38.  Thereafter, the defendant was arrested on February 17, 2012 attempting to cross the land border between Serbia and Hungary when "border officers ran his passport, and determined

that ZAVISIC was a positive match to an Interpol Red Notice which had been filed for his extradition to the United States." Dkt. #19-1, p.45. In a Report, Recommendation and Order filed on January 9, 2013 and adopted by United States District Judge Richard J. Arcara on April 19, 2013 in *United States v. Cheng*, 05-CR-71A, this Court concluded that the end date for purposes of determining the length of delay was the date the government commenced extradition proceedings. Similarly, in *United States v. Risi*, 10-CR-46, in its Report, Recommendation and Order filed May 20, 2013, this Court concluded that the end date for purposes of determining the length of delay was the date the government commenced extradition proceedings.[5] Here, this Court concludes that the date the government filed the Red Notice with Interpol, February 10, 2012, is the date the length of delay concludes.

### (2) Reasons for the Delay

Following his initial appearance on this Court's Criminal Complaint on October 10, 2006, the defendant was released on a $5,000 bond and returned to his residence in Canada. The matter was adjourned to October 25, 2006 for a preliminary hearing. On October 25, 2006, the defendant, by his counsel, requested an adjournment of the preliminary hearing relative to the charges in the Criminal Complaint which request was granted. The Court adjourned the matter to December 27, 2006

---

[5] In both *United States v. Cheng* and *United States v. Risi*, this Court recommended that since the government failed to put forth a reasonable explanation for not taking any action whatsoever during a period of six and five years, respectively, the Indictments be dismissed based on violations of each of the defendant's right to a Speedy Trial under the Sixth Amendment to the Constitution.

with a conditional order that if the matter was not resolved by that date, the Criminal Complaint would be automatically dismissed without prejudice pursuant to Rule 48 of the Federal Rules of Criminal Procedure.  Dkt. #6.  By reason of the conditional Order entered on October 25, 2006 and to be effective on December 27, 2006, the Criminal Complaint was dismissed as of December 27, 2006.  No bail violation was ever filed against the defendant and he did not fail to appear at any required court appearance.  In fact, the $5,000 cash bail posted was returned to the defendant's mother.

Thereafter, on August 14, 2007, a sealed indictment against the defendant was filed charging him with having violated Title 21, United States Code, Sections 841(a)(1), 846, 952(a) and 963.  Dkt. #1.  A warrant for his arrest was issued on that date.   Sometime prior to August 27, 2007, the defendant moved to Serbia and on August 27, 2007 he began work at Studio Moderna in Novi Sad, Serbia and continued his employment there until September 2012.  Dkt. #15-1, ¶¶13-14.   On October 14, 2007, the defendant was married and on June 6, 2008, they had their only child.  Dkt. #15-1, ¶¶15-16.  In 2008, the defendant applied to the Canadian government for recognition of his son's Canadian citizenship and for a Canadian passport for his son.  *Id*. at ¶18.  The application filed with the Canadian embassy in Belgrade contained the defendant's home address and other contact information.  *Id*. at ¶19.  The requests for Canadian citizenship and a Canadian passport were granted.  *Id*. at ¶20.

During the course of his employment, the defendant traveled extensively using his Canadian passport. Dkt. #15-1, ¶¶24-25. Moreover, the defendant maintains that he lived openly and in plain sight and filed his Serbian address with the Canadian embassy. *Id*. at ¶¶ 23 and 25. "As a non-citizen, the Serbian government imposed stringent requirements upon him. To satisfy these obligations, Mr. Zavisic maintained a visa filed with the Ministry of the Interior, maintained a file with the police in Novi Sad, appeared for interviews at the police station, and then checked in at the station every three months, and maintained a work permit issued by the Labor Office." *Id*. at ¶¶28-29. In or about February 2009, the defendant became a dual Serbian-Canadian citizen. *Id*. at ¶29.

Despite the return of an Indictment in August 2007, the government did nothing to attempt to locate the defendant. In fact, it was not until August 24, 2009, that Immigration and Customs Enforcement requested information from Canadian authorities to determine whether the defendant had in fact left Canada. Dkt. #19, pp.4-5.

In or about June 2011, the defendant applied to the Canadian embassy to replace his expired passport and filed his latest home and work addresses at that time. Dkt. #15-1, ¶30.

After another two years of doing nothing, on September 1, 2011, ICE Buffalo reached out via e-mail to the Homeland Security Investigations Deputy Attache

at the U.S. Embassy in Vienna, Austria for assistance in locating the defendant.  Dkt. #19, p.5 and Dkt. #19-1, pp.17-19.  It is clear from the e-mail exchanges that although an arrest warrant had been entered into NCIC, an arrest warrant had not yet been filed with Interpol.  Dkt. #19-1, p.18.  In order to complete an Interpol Red Notice (International wanted persons alert), the arrest warrant and Indictment were unsealed on October 12, 2011.  Dkt. #19, p.5.  As of February 10, 2012, the Red Notice was filed with Interpol.  Dkt. #19-1, p.38.  On February 17, 2012, the defendant was arrested attempting to cross the land border from Serbia into Hungary.  Dkt. #19-1, p.45.  The extradition package was signed by the AUSA on March 15, 2012 and Hungary ordered the extradition of the defendant on June 28, 2012.  Dkt. #19, p.5.

The government acknowledges that it bears the ultimate burden in bringing a defendant to trial and that it was "under the obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution."  *Rayborn v. Scully, supra* at 90.  In addition, the government argues that the defendant had obtained his Serbian citizenship and Serbia is not bound to extradite its nationals.  Perhaps recognizing that it has little to offer concerning this factor, the government states:

> Although the government's delay in initiating the extradition process is not ideal, there is no evidence that it was pursued in furtherance of a strategy to "delay the trial in order to hamper the defense," which under any circumstance, should "be weighted heavily against the government." Barker, 407 U.S. at 531. Instead, negligence in pursuing the defendant is the very type of "neutral" delay, Barker, 407 U.S. at 531, that "should be weighed less heavily against the government," Rayborn, 858 F.2d at 91.

Dkt. #19, p.14.

By its decision in *Smith v. Hooey*, 393 U.S. 374, 383 (1969), the United States Supreme Court established that the government has an affirmative obligation to locate and apprehend a known suspect. As the court of Appeals for the Second Circuit has ruled:

> The determination as to whether a state has made sufficient efforts to satisfy the "due diligence" requirement is a fact-specific one, however, and the precise amount of effort that is required is apt to vary depending on the circumstances of the case.

*Rayborn, supra* at 90.

The government does not dispute that from the date the sealed Indictment was returned (August 14, 2007) to August 24, 2009 (a period of two years) it did nothing to attempt to locate the defendant. The Court takes exception with the government's statement that in August 2007, the defendant was entered into NCIC as a fugitive. Rather, the defendant was a named defendant in a sealed Indictment, for whom an arrest warrant had just been issued. For the period December 27, 2006 to August 14, 2007, there were no charges pending against the defendant and he was free to travel anywhere in the world.

The government offers no evidence to contradict the defendant's assertion that at least as early as August 27, 2007, when he began working for Studio Moderna in Novi Sad, Serbia, he was living openly and in plain sight. In fact defendant

was married, had a child, sought recognition for his son's Canadian citizenship and maintained contact regularly with the Serbian government and the Canadian embassy.

For another period of two years, from August 24, 2009 to September 1, 2011, the government did nothing to determine the defendant's whereabouts. In fact it wasn't until October 2011 that the government began the process of drafting the Red Notice, including unsealing the Indictment and arrest warrant on October 12, 2011. From the facts presented by the government, it appears that the Red Notice was not filed with Interpol until February 10, 2012 and the defendant was arrested 7 days later on February 17, 2012. Therefore, this Court will consider the period of delay from August 14, 2007 to February 10, 2012 (four years and nearly 6 months) for purposes of resolving the defendant's motion to dismiss the indictment. The government offers no explanation for any of the aforementioned periods of delay. As a result, the government's total inaction in seeking to locate the defendant and have him extradited during the period from August 14, 2007 to February 10, 2012 played a substantial role in delaying the defendant's apprehension. Therefore, I find that this period of approximately four and one-half years tips against the government and in favor of the defendant in this "balancing process."

### (3)    The Defendant's Assertion Of His Right

Insofar as the Criminal Complaint against the defendant was dismissed by conditional Order of this Court effective December 27, 2006 and the Indictment that was returned on August 14, 2007 remained sealed until October 12, 2011, the

defendant was unaware that there were any charges pending against him and therefore, no reason to assert a speedy trial right. The defendant was arrested on February 17, 2012 attempting to cross the land border between Serbia into Hungary and remained in Hungarian custody until he was escorted by the United States Marshals Service from Budapest, Hungary to the United States on September 21, 2012. The defendant was arraigned on the Indictment before this Court on September 28, 2012 and at that time the Court entered a Scheduling Order setting December 14, 2012 as the deadline for the filing of motions. On two occasions, December 13, 2012 and February 8, 2013 the defendant, by his counsel, sought an extension of time to file motions. The instant motion to dismiss based on Sixth Amendment Speedy Trial Act violations was filed on March 22, 2013. Accordingly, the defendant asserted his Speedy Trial Act claims as soon as his motions were filed. As the Supreme Court further stated:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that the failure to assert the right will make it difficult for the defendant to prove that he was denied a speedy trial.

*Barker, supra* at 532. However, "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, *supra* at 652.

The defendant can not claim that he was subjected to oppressive pretrial incarceration; nor does he claim anxiety and concern during the period of delay; nor does he expressly assert that the delay has caused his defense to be impaired. Rather, the defendant asserts that there is "a powerful presumption of prejudice." Moreover, the defendant asserts that he has in fact suffered specific prejudice in the nature of the anxiety and concern of the accused for his wife and young son.  In support of this argument, the defendant states,

> In Serbia, Mr. Zavisic established himself in the community. He married his fiancé and they decided to have a child, a decision he would not have made had he known of the Indictment. Thus, the generalized anxiety experienced by all criminal defendants is, for Mr. Zavisic, particularly acute. Indeed, it is excruciating for him when, for example, he must tell his son that he is still "away on business." Moreover, he cannot now move his family back to Canada to be nearer to them through his ordeal, as such a significant change would be detrimental to his son's welfare. Similarly, the loss of his job and income is particularly prejudicial because Mr. Zavisic assumed financial obligations during the period of delay that he would not have assumed had the Government proceeded promptly.

Dkt. #15, pp.19-20.


Based on the foregoing, it is this Court's finding that there is no period of delay which may be attributed to and which is a direct consequence of the defendant's own behavior.  It is because of the government's own inaction and failure to take action in the prosecution of this case for a period of nearly fifty-four (54) months, *to wit*, August 14, 2007 to February 10, 2012, that it is reasonable to find that this delay "intensifie[d]" the "presumption that pretrial delay has prejudiced the" defendant.  *Doggett, supra* at

652.  The government has not offered anything that would justify a rebuttal of this "powerful presumption of prejudice."

**CONCLUSION**

Based on the foregoing, I find that the "balancing process" causes me to conclude that the conduct of the government in failing to exercise "due diligence" in apprehending and extraditing defendant and going forward with the prosecution of this case resulted in "prolonged and unjustifiable delays" that can not be condoned nor tolerated.  *Doggett*, *supra* at 656-657.  Since the government has totally failed to put forth a reasonable explanation for not taking any meaningful action during the period August 14, 2007 and February 10, 2012, a total period of delay of approximately four and one-half years, that period of delay tips against the government on the balancing scale.  As a result, it is recommended that the defendant's motion to dismiss the indictment herein based on a violation of his right to a speedy trial under the Sixth Amendment of the Constitution be GRANTED.  This recommendation is made with full knowledge that in doing so, it results in "a serious consequence because it means that a defendant who may be guilty of a serious crime will go free without having been tried." *Barker, supra* at 522.  Nevertheless, a message needs to be sent to the government if the concept of speedy trial is to be enforced and that "official negligence" in the prosecution of criminal cases will not be tolerated.[6]

_____

[6] Similar recommendations were made by this Court to Judge Arcara in the case of *United States v. Cheng*, 05-CR-71A, on January 9, 2013 (adopted in its entirety on April 19, 2013) and to Chief Judge Skretny in the case of *United States v. Risi,* 10-CR-46S on May 20, 2013 (objections pending).

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:     Buffalo, New York
            August 15, 2013

*s/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**